UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

            -against-

KELVIN ALEXANDER,

            Defendant.
------------------------------------------------------------x

REPORT AND
RECOMMENDATION

07-CR-613 (SJ)

ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:

Currently pending before this Court, on a referral from the Honorable Sterling Johnson, Jr., is a motion by defendant Kelvin Alexander ("defendant") to suppress a weapon seized by the police from defendant's duffel bag, as well as statements made by defendant following his arrest. On May 7 and 16, 2008, this Court held an evidentiary hearing, at which the government called Police Officer Michael Smith ("Smith") and Smith's partner, Officer Frank Desiderato ("Desiderato"). The defense called no witnesses, but did offer into evidence two maps of the area where the officers, who were investigating a bank robbery, detained defendant and searched his bag.

Defendant's suppression argument is three-fold. First, he alleges that the officers lacked reasonable suspicion to justify their initial seizure of him. Second, he argues that that seizure ripened into a de facto arrest, unsupported by probable cause. Finally, defendant contends that the search of his bag, and his post-arrest statements, were the tainted products of the illegal seizure and/or de facto arrest. See Transcript of 5/16/08 Hearing ("5/16/08 Tr.") at 60-64. In advancing these arguments, the defense cites numerous inconsistencies between the account offered by Smith on the first day of the hearing and the testimony of Desiderato at the

final session. See 5/16/08 Tr. at 53-60. In response, the government characterizes the inconsistencies as minor and immaterial, and argues that, even if the inconsistent portions were disregarded, the record contains sufficient proof on which to sustain the officers' detention of defendant and subsequent search of his bag. See 5/16/08 Tr. at 65-67.

For the reasons set forth below, and having considered all the evidence, this Court recommends granting the defense motion in its entirety.

## I. THE EVIDENCE AT THE HEARING

### A. Facts Testified To By Both Witnesses

On April 27, 2007, at approximately 1:00 p.m., Smith and Desiderato were on patrol in the 120th precinct in Staten Island, when they received a description over their police car radio of a suspect who had just robbed a bank on Forest Avenue. See Transcript of 5/7/08 Hearing ("5/7/08 Tr.") at 3; 5/16/08 Tr. at 5-6. Smith and Desiderato were assigned to canvass the immediate area for anyone matching the description of a black male wearing dark clothing. See 5/7/08 Tr. at 3-4; 5/16/08 Tr. at 6. Shortly after beginning their canvass, Smith and Desiderato stopped a black male wearing dark clothing in a parking lot near the bank.[1] See 5/7/08 Tr. at 15; 5/16/08 Tr. at 11-12. They temporarily detained this man until a witness from the bank arrived and determined that the man was not the robber. See 5/7/08 at 15-16; 5/16/08 Tr. at 12. The officers then released the man, and continued to search the area in their vehicle. See 5/7/08 Tr. at 16; 5/16/08 Tr. at 12.

---

[1] Smith testified that this first encounter took place four or five blocks from the bank, see 5/7/08 Tr. at 15, while Desiderato testified that it occurred "directly behind the bank." See 5/16/08 Tr. at 11.

2

Twenty minutes after the robbery and about a mile from the bank, Smith and Desiderato observed from a distance another black male, wearing dark clothing and holding a blue duffel bag, running westbound along a commercial stretch of Forest Avenue. See 5/7/08 Tr. at 4, 6, 38, 50; 5/16/08 Tr. at 6-8. The officers subsequently identified this black male as defendant. See 5/7/08 Tr. at 53-54; 5/16/08 Tr. at 9. When the officers lost sight of defendant, Desiderato spoke with a civilian on the street, who indicated that the man had gotten onto a bus on Forest Avenue. See 5/7/08 Tr. at 26, 35-36; 5/16/08 Tr. at 8, 40-41.

After blocking the bus with their police vehicle, Desiderato and Smith approached the bus and, at the direction of one of the officers, defendant exited the bus. See 5/7/08 Tr. at 41-42; 5/16/08 Tr. at 9-10. The officers informed defendant that he matched the description of a suspect in a recent bank robbery and sought to detain him so that a witness from the bank could determine whether defendant was indeed the suspect. See 5/7/08 Tr. at 9, 14; 5/16/08 Tr. at 10. During this detention, defendant stated that the officers could look in his duffel bag. See 5/7/08 Tr. at 55; 5/16/08 Tr. at 10. Smith opened defendant's bag and observed what appeared to be a firearm. See 5/7/08 Tr. at 11, 45; 5/16/08 Tr. at 10. Smith told Desiderato to "cuff him," whereupon defendant immediately fled the scene. See 5/7/08 Tr. at 45; 5/16/08 Tr. at 11. Defendant was eventually apprehended on a nearby street, where he was held until a bank witness arrived and concluded that he was not the suspected bank robber. See 5/7/08 Tr. at 14-16; 5/16/08 Tr. at 14. At the time of his apprehension, defendant, who is 6'4" tall, was

wearing a dark blue jacket and blue jeans.[2] See 5/7/08 Tr. at 47; 5/16/08 Tr. at 21.

Defendant was subsequently charged with unlawful possession of a firearm by a convicted felon, pursuant to 18 U.S.C. § 922(g)(1). See generally 6/29/07 Complaint and Affidavit in Support of Application for Arrest Warrant. He now moves to suppress the weapon found in his duffel bag, as well as his post-arrest statements. See generally 3/28/08 Motion to Suppress Physical Evidence and Statements.

### B. Conflicts in the Testimony

#### i. Officer Smith's Version

While conducting a canvass of the area surrounding the bank, Smith was driving a marked police car in which Desiderato was a passenger. See 5/7/08 Tr. at 5, 6, 17. The sole description of the bank robber provided over the radio was "male, black, dark clothing." See 5/7/08 Tr. at 3-4, 17-18, 20.

Twenty minutes later, Smith observed defendant, a black male wearing navy blue clothing and holding a dark-colored bag, near the corner of Maple Parkway and Forest Avenue. See 5/7/08 Tr. at 4, 47, 53-54. Defendant was standing behind a store, on a passageway north of and parallel to Forest Avenue, near the corner of Maple Parkway. See

---

[2] During his redirect examination, Desiderato stated that defendant wore a wool hat, see 5/16/08 Tr. at 51, while Smith recalled only a navy blue jacket and blue jeans, see 5/7/08 Tr. at 47, and was never asked about or mentioned any headgear. See generally 5/7/08 Tr.

4

Ex. A;[3] 5/7/08 Tr. at 34, 38, 51.[4] Defendant looked in the direction of the police car and then turned and immediately ran into the store. See 5/7/08 Tr. at 5-6; 22. Smith temporarily lost sight of defendant as he ran through the store, but saw him exit the front door of the store and run westbound onto Forest Avenue. See 5/7/08 Tr. at 26, 29-30. Smith drove the police car to the corner of Maple Parkway and Forest Avenue and parked it in front of a city bus at that corner. See Ex. A; 5/7/08 Tr. at 31, 33. At this point, Smith had again lost sight of defendant. See 5/7/08 Tr. at 34-35. Desiderato asked a group of people on the corner if they had observed anyone running in a panic; he provided no further description. See 5/7/08 Tr. at 36, 40. A civilian replied that "he just got on the bus," and indicated a city bus that the officers had already blocked with their vehicle. See 5/7/08 Tr. at 36, 40. The bus doors were open, and people were entering and exiting the bus. See 5/7/08 Tr. at 40.

Smith and Desiderato approached the bus and saw defendant at the top of the front steps to the bus. See 5/7/08 Tr. at 41. Smith asked defendant if he would step off the bus, so that the officers could speak with him. See id. Smith also inquired why defendant was running, and defendant put up his hands up and said he had not done anything. See 5/7/08 Tr. at 42. Smith then escorted defendant from the bus to his partner by placing Smith's hand on defendant's back. See id. Smith asked defendant what was in the bag, and defendant replied

---

[3] Exhibit A, a map of the area, is reproduced in the Appendix to this Opinion.

[4] Initially, Smith testified that he first observed defendant in the rear of the store while the police vehicle was on Maple Parkway. See 5/7/08 Tr. at 29. Smith then clarified that he was on a dead-end street next to Maple Parkway, see id. at 34, 38, 51, and finally conceded that he was not sure of the vehicle's exact location when he first observed defendant. See id. at 53.

that Smith could go ahead and look in the bag and that there were work tools inside. See 5/7/08 Tr. at 55. Smith opened the bag, observed what appeared to be a weapon, and told Desiderato to "cuff him." See 5/7/08 Tr. at 11, 45. Defendant immediately began to run, with Officer Smith in pursuit, while Desiderato stayed behind with the bag. See 5/7/08 Tr. at 46.

### ii. Officer Desiderato's Version

While conducting a canvass of the area surrounding the bank, Desiderato (not Smith) was driving a marked police car, with Smith as a passenger. See 5/16/08 Tr. at 8. The radioed description of the bank robber was male black, approximately 5'10" to 6'0" tall, wearing a black jacket, black jeans, facial hair and a navy blue wool cap. See 5/16/08 Tr. at 6, 21, 51.[5]

Twenty minutes later, Desiderato was driving westbound on Westbrook Avenue when he spotted defendant running westbound on Forest Avenue; Desiderato was able to view him through a parking lot. See Ex. A; 5/16/08 Tr. at 5-8, 32-33. Desiderato lost sight of defendant and continued westbound to Lake Avenue, where Desiderato turned left onto Lake Avenue and headed south to the intersection of Lake and Forest Avenues. See 5/16/08 Tr. at 33-34. After turning eastbound onto Forest Avenue, somewhere in the vicinity of Sanders

---

[5] Desiderato previously testified at a parole hearing in May 2007 that he had written down the description of the suspected bank robber's height as between 5'6" and 6'0". See 5/16/08 Tr. at 24-25.

6

Street,⁶ Desiderato pulled up near a school crossing guard and asked her: "Did you see a male black running up the street carrying a blue duffel bag?" See 5/16/08 Tr. at 40-41, 47-48. The crossing guard replied that "h[e] just got on the bus," and she pointed to a bus that was in motion westbound on Forest Avenue, near Lake Avenue. See 5/16/08 Tr. at 40, 47-48.

Desiderato and Smith then proceeded to follow the bus westbound on Forest Avenue for several blocks. See 5/16/08 Tr. at 41-42, 45. The bus stopped just before the intersection of Forest Avenue and Maple Parkway, and Desiderato pulled the police car in front of the bus, so as to stop its progress. See 5/16/08 Tr. at 43, 45. As Desiderato and Smith approached the bus, the doors opened and Desiderato "took [defendant] off the bus." See 5/16/08 Tr. at 9, 44. Desiderato explained to defendant that he fit the description of a bank robber in the area. See 5/16/08 Tr. at 10. Defendant appeared nervous and stated that he was a black man in America and "you know how that goes." See id. Desiderato asked defendant if it would be okay if Desiderato looked in the bag. See id. Defendant told Desiderato, "No, no, go ahead. It's just work tools," and set down the bag. See id. Smith then unzipped the bag, observed what appeared to be a firearm, and told Desiderato to "cuff him." See 5/16/08 Tr. at 11. Defendant immediately began to run, and both Smith and Desiderato chased after him on foot. See 5/16/08 Tr. at 13. The bag was left at the scene. See id.

---

⁶ At one point, Desiderato testified that he did not recall whether he turned westbound or eastbound onto Forest Avenue from Lake Avenue, see 5/16/08 Tr. at 37, but he later recounted that in pursuing the city bus, the police vehicle drove past Lake Avenue, which would indicate that Desiderato had earlier proceeded eastbound onto Forest. See Ex. A.; 5/16/08 Tr. at 41-42, 47-48.

## II. DISCUSSION

### A. Applicable Law

The Second Circuit has summarized the three basic levels of interaction between law enforcement officers and members of the general public: consensual encounters, investigative detentions, and arrests. See United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995). Each type of interaction must conform with certain limitations imposed by the Fourth Amendment's protection against unreasonable searches and seizures. For example, police officers require no justification to initiate a consensual encounter with a private citizen, as long a reasonable person in those circumstances would understand that he or she was under no obligation to cooperate and was free to terminate the encounter at any time. See United States v. Stone, 73 F.Supp.2d 441, 445 (S.D.N.Y. 1999). In contrast, in order to subject an individual to an investigative detention or limited seizure, an officer must have "reasonable suspicion" that criminal activity has just occurred or is imminent. See Tehrani, 49 F.3d at 58. Finally, an arrest requires a showing of probable cause. See id.

During a limited seizure or "*Terry* stop," named for the Supreme Court's landmark decision in Terry v. Ohio, 392 U.S. 1 (1968), a police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry). An assessment of whether an officer's suspicion is reasonable and sufficiently supported by articulable facts requires an objective analysis of the "totality of the circumstances" surrounding the detention. See United

States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000). "If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a de facto arrest that must be based on probable cause." United States v. Babwah, 972 F.2d 30, 33 (2d Cir. 1992) (internal quotation and citation omitted).

Once a defendant has established a warrantless seizure, the government bears the burden of proving, by a preponderance of the evidence, that the officer had reasonable suspicion for the stop or, in the case of an arrest, probable cause. See United States v. Morris, 07-CR-29 (NG) (JO), 2007 WL 4351427, at *5 (E.D.N.Y. Dec. 12, 2007); United States v. Ferguson, 130 F.Supp.2d 560, 565-66 (S.D.N.Y. 2001) (citing United States v. Perea, 986 F.2d 633, 644-45 (2d Cir. 1993)).

B.   **Reasonable Suspicion**

The government contends that the officers' removal of defendant from the bus constituted a *Terry* stop supported by reasonable suspicion. See The Government's Memorandum of Law in Opposition to the Defendant's Motions at 7; 5/16/08 Tr. at 73.[7] As an initial matter, the Court notes the gross inconsistencies between Smith's version of events leading up to the encounter with defendant and Desiderato's recollection. At both the start and conclusion of the May 16 hearing, the government acknowledged these inconsistencies and maintained that the conflicts were on minor points and merely the result of faulty memories, as opposed to dishonesty. See 5/16/08 Tr. at 3-4, 65, 68. For the most part, the government did

---

[7] It thus is undisputed that the encounter was not consensual.

not embrace the testimony of one officer over the other.[8] See 5/16/08 Tr. at 3-4, 68. Rather, government counsel urged the Court to consider both accounts as probative but to regard the testimony of Desiderato as more detailed due to his status as the arresting officer. See 5/16/08 Tr. at 67-68. Alternatively, the government argued that the Court could disregard all the inconsistent portions but nonetheless find that the officers' conduct was lawful. See 5/16/08 Tr. at 65-71.

Contrary to the government's contention, the inconsistencies in Smith and Desiderato's versions of the events leading up to their initial confrontation with defendant are hardly insignificant. In fact, each account relies on a different theory of reasonable suspicion. Smith testified that defendant's flight into the store upon looking in the direction of the police vehicle, coupled with defendant's fitting the vague description of a black male in dark clothing, led Smith to conclude that defendant might have been involved in the robbery; it was for that reason that Smith allegedly attempted to follow him in the police vehicle. See 5/7/08 Tr. at 6. In contrast, Desiderato made no mention of any flight from the officers; rather, he testified that he first saw a person who matched the radioed description running along a commercial section of Forest Avenue. See 5/16/08 Tr. at 8, 33.[9] While the government seeks to minimize the significance of this discrepancy, the Court remains skeptical. Even assuming *arguendo* that Desiderato (in contrast to Smith) did not observe defendant until after he ran onto Forest

---

[8] But see *infra* note 11.

[9] On cross-examination, the defense established that defendant was running in the direction of a bus stop. See 5/16/08 Tr. at 49, 59.

10

Avenue, Smith surely would have informed his partner of his earlier observation of the flight of a person matching the bank robber's description.[10] Yet according to Desiderato's testimony, he first became aware of defendant's presence when he saw him on Forest Avenue. See 5/16/08 Tr. at 8, 31, 35.

The officers' accounts also differed as to the radioed description of the bank robber. The government argues that Desiderato's description, which includes references to height, facial hear and a hat, is simply more complete and supplements Smith's testimony. But Smith unequivocally testified several times that the sole description provided over the radio was that of male, black, with dark clothing. See 5/7/08 Tr. at 3-4, 6, 17-18, 20. That Desiderato was subsequently designated the arresting officer does not render his testimony more credible or accurate. Further, the officers differed as to where along Forest Avenue defendant was first sighted (i.e., near Maple Parkway versus Westbrook Avenue),[11] see 5/7/08 Tr. at 4; 5/16/08 Tr. at 7, or whether they pursued the bus for several blocks or happened to cut it off incidentally at an intersection while stopping to talk to civilians. See 5/7/08 Tr. at 36, 40; 5/16/08 Tr. at 41-42, 45. In addition, Desiderato testified that he "took [defendant] off the bus," see 5/16/08 Tr. 44, whereas Smith maintained that it was he who simply "asked

---

[10] Indeed, Smith implied that he and his partner both saw defendant behind the store. See 5/7/08 Tr. at 22 (repeatedly referring to what "we" saw).

[11] During her closing remarks, government counsel suggested that Officer Smith "may have been mistaken about the streets" because, in contrast to Desiderato, Smith's testimony was given without "the benefit of a map." See 5/16/08 Tr. at 82. However, Smith acknowledged that he was familiar with that area of Staten Island, and even used geographical parlance familiar to denizens of Staten Island. See 5/7/08 Tr. at 27-28, 36.

[defendant] if he would like to step off and speak to us"; Smith further asserted that the officers would have departed had defendant refused. See 5/7/08 Tr. at 41. Finally, the witnesses did not even agree on who was driving the police vehicle. See 5/7/08 Tr. at 6; 5/16/08 Tr. at 8. Although this latter point is not essential to the Court's ruling, it underscores the dramatic differences in the officers' recollections and/or stories.

Simply put, the witnesses provided contrary accounts of the events of April 27, 2007, thereby implicating distinct legal justifications for their encounter with defendant. Faced with these conflicts, this Court cannot ascertain with any degree of confidence what in fact transpired prior to that encounter.[12]

Even if the Court were inclined to disregard all the inconsistent portions of the officers' testimony, and rely solely on those facts that were uncontradicted, the government nevertheless could not sustain its burden. Although reasonable suspicion is a less demanding standard than probable cause, officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000) (quoting Terry, 392 U.S. at 27).

According to the uncontradicted facts, defendant was observed, from a distance, running down Forest Avenue and, like the suspected bank robber, was a black male (of

---

[12] Indeed, at the conclusion of all the evidence, the Court noted that, having read the parties' pre-hearing submissions as well as the criminal complaint, it was "shocked" to hear Officer Smith's divergent version of the events. See 5/16/08 Tr. at 70.

unspecified age and build) wearing dark clothing.[13] Given the other facts surrounding this observation – namely, that the sighting took place midday on an avenue with shopping plazas and stores in an area with a significant black population,[14] twenty minutes after the robbery and a mile away from the bank, and that defendant was running in the direction of a bus stop – the observation did not provide reasonable suspicion to detain defendant.[15] As the court observed in United States v. McCloud, No. 06-CR-6233L, 2007 WL 3354189 (W.D.N.Y. Aug. 16, 2007), "identification of race, even accompanied by a vague characterization of clothing, does not describe a suspect with sufficient detail or identifying characteristics to meaningfully set him apart from other members of the community." Id. at *7, citing United States v. Swindle, 407 F.3d 562, 569-70 (2d Cir. 2005) ("race, when considered by itself and sometimes even in

---

[13] Desiderato's more detailed account of the radioed description, even if credited, does not establish reasonable suspicion to detain defendant. First, there was no evidence presented as to whether defendant had facial hair. Second, there was no proof as to the color of the hat that defendant was wearing. See 5/16/08 Tr. at 51. Finally, defendant, standing at 6'4", is far taller than the range of 5'10"- 6'0", the approximate height of the bank robber. See 5/16/08 Tr. at 57. It should also be noted that the radioed description recounted by neither officer included a bag.

[14] When asked on cross-examination whether "blacks make up a significant portion of the public on that area [of Forest Avenue]," Smith replied "yes." See 5/7/08 Tr. at 38. Desiderato neither commented on nor was asked about this issue.

[15] The facts of this case are thus distinguishable from those cases in which the defendant was observed acting in a suspicious manner and/or the suspect had been described with greater particularity and/or had been observed leaving the scene of the crime headed in the direction where the defendant was later stopped. See, e.g., United States v. Jackson, 652 F.2d 244 (2d Cir. 1981); Lee v. City of New York, No. 00-CV-3181 (JG), 2002 WL 1732810 (E.D.N.Y. July 22, 2002); United States v. Medina, No. 5394 Cr. 872(SAS), 1998 WL 241724 (S.D.N.Y. May 11, 1998); Dempsey v. Town of Brighton, 749 F.Supp. 1215 (W.D.N.Y. 1990).

tandem with other factors, does not generate reasonable suspicion for a stop"); see, e.g., Goodson v. City of Corpus Christi, 202 F.3d 730, 737 (5th Cir. 2000) (police bulletin did not give police officer "reasonable suspicion to stop and frisk any tall, heavyset, white man," as "[s]uch a description would simply be too vague, and fit too many people, to constitute particular, articulable facts on which to base reasonable suspicion"); see also 5/16/08 Tr. at 70 (government concedes that description of "male black" would not without more establish reasonable suspicion).

Accordingly, the government has failed to establish by a preponderance of the evidence that the officers had reasonable suspicion to believe that defendant was involved in the bank robbery, and, as such, the officers' investigatory stop was unlawful. See, e.g., Morris, 2007 WL 4351427, at *9 (granting suppression of weapon and statements where officers' testimony concerning the stop was conflicting; observing that "[i]t is the government's burden to do more than provide a possible and plausible explanation - it is the government's burden to establish the lawfulness of the stop by a preponderance of the evidence."); Ferguson, 130 F.Supp.2d at 566 (granting motion to suppress gun and other evidence seized following car stop, where detectives' testimony was "replete with inconsistencies and contradictions.").[16]

### C. Search of Bag and Post-Arrest Statements

Defendant contends that any consent that he gave to search his bag was tainted by the

---

[16] Because this Court concludes that the government failed in its burden to prove that the officers had reasonable suspicion to detain defendant pursuant to an investigatory stop, it need not address defendant's alternative argument that the stop amounted to a de facto arrest. The Court stands ready to address this alternative argument in the event the District Court reaches a contrary conclusion with respect to reasonable suspicion.

14

illegal seizure.[17] Under the "fruit of the poisonous tree" doctrine, a search or seizure that would otherwise be valid can be tainted by prior unlawful conduct. See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); accord Mosby v. Senkowski, 470 F.3d 515, 520 (2d Cir. 2006). The focus primarily becomes whether defendant's consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." See Wong Sun, 371 U.S. at 486. Relevant to this consideration is "whether a *Miranda* warning was given, the temporal proximity of the detention and the alleged consents, the presence of intervening circumstances, and the purpose and flagrancy of the illegal arrest." United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987) (citing Brown v. Illinois, 422 U.S. 590, 603-05 (1975)). The government bears the burden of proving a break in the casual chain. See Ceballos, 812 F.2d at 50.

In the present case, no *Miranda* warnings were given prior to the consent to search. More telling, both officers testified that they obtained defendant's consent to search within minutes of their initial confrontation of him, and the government has alleged no intervening circumstances. See 5/7/08 Tr. at 11; 5/16/08 Tr. at 12. The Court thus has been presented with no facts to dissipate the taint resulting from the illegal stop. See Ceballos, 812 F.2d at 50. Accordingly, defendant's motion to suppress the weapon found in his duffel bag should be granted.

---

[17] In response to the Court's inquiry at the conclusion of the hearing, defense counsel also argued that inconsistencies between Smith and Desiderato's testimony preclude a finding that defendant consented to a search of his bag. See 5/16/08 Tr. at 63-64. However, in this respect their accounts were largely consistent: Desiderato claimed that he asked defendant for permission to look into the bag, to which defendant replied: "No, no, go ahead. It's just work tools." See 5/16/08 Tr. at 10. Smith recounted that he merely asked what was inside the bag, to which defendant replied: "Go ahead. It's just tools." See 5/7/08 Tr. at 10, 55. They thus agreed that defendant gave the officers permission to look in the bag.

15

Likewise, the Court concludes that defendant's post-arrest statements should be suppressed. The record is somewhat underdeveloped as to exact time line of defendant's post-arrest statements, save for the fact that some took place when defendant was apprehended on nearby Van Pelt Avenue and some occurred at Central Booking while Desiderato processed him later that day. See 5/16/08 Tr. at 15-18. At the time of the Van Pelt stop, Desiderato did administer partial *Miranda* rights from memory, see 5/16/08 Tr. at 15, but this is not a *per se* cure, particularly given the incomplete nature of the warnings.[18] See Brown, 422 U.S. 590 at 603 ("But the *Miranda* warnings, alone and per se, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."); accord United States v. Delgado, 797 F.Supp. 213, 221-22 (W.D.N.Y. 1991). Significantly, defendant's statements followed the search of his bag and his formal arrest, both of which flowed from the unlawful initial detention. The government cites no intervening circumstance that would break the chain of illegality with respect to the post-arrest statements. See Ceballos, 812 F.2d at 50; Morris, 2007 WL 4351427, at *9. Therefore, the Court recommends granting defendant's motion to suppress his post-arrest statements.[19]

---

[18] Desiderato failed to advise defendant that an attorney would be appointed to represent him if he could not afford to retain counsel. See 5/16/08 Tr. at 15.

[19] As suppression is warranted under the Fourth Amendment, the Court need not address the parties' Fifth Amendment suppression arguments. See 5/16/08 Tr. at 63, 77-78.

## III. CONCLUSION

In sum, the Court concludes that the government failed to prove by a preponderance of the evidence that Smith and Desiderato had reasonable suspicion to stop defendant in connection with a bank robbery investigation. Due to the illegal nature of the stop, the Court further concludes that defendant's consent to search his duffel bag, as well as his post-arrest statements, are tainted. Accordingly, the Court recommends that defendant's motion to suppress be granted in its entirety.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Sterling Johnson, Jr. on or before July 2, 2008. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

Dated: Brooklyn, New York
June 18, 2008

ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE



A-A
...dence